**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| Monticello Enterprises, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Petco Health & Wellness Company, Inc., et al.<br><br>Defendants. | CIVIL ACTION NO. 6:23-CV-00761-XR |

**PLAINTIFF MONTICELLO'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1
II. LEGAL BACKGROUND ..... 2
A. The Standard of Review for a Rule 12(b)(6) Motion ..... 2
B. A Finding of Invalidity at the Pleading Stage is Seldom Warranted ..... 2
C. Section 101 of the Patent Act ..... 3
1. Software and Business Methods are Patent-Eligible ..... 4
2. The Supreme Court's Two-Part Test for Determining Patent Eligibility ..... 4
D. The Touchstone for Validity under § 101 is a Lack of Pre-emption ..... 6
III. TECHNOLOGY AT ISSUE IN THE MONTICELLO PATENTS ..... 7
IV. ARGUMENT ..... 9
A. The Patent Office has Already Determined that the Challenged Claims are Patent Eligible ..... 10
B. The Claims Are Not Directed To an Abstract Idea ..... 12
1. Defendants Mischaracterize what the Asserted Claims are "Directed To" ..... 13
2. The Asserted Claims are Not Directed To an Abstract Idea ..... 14
i. The '408 and the '186 Claims are Not Directed to an Abstract Idea ..... 15
ii. The '266 Claims are Not Directed to an Abstract Idea ..... 17
iii. The '139 Claims are Not Directed to an Abstract Idea ..... 18
iv. The '828 and '497 Claims are Not Directed to an Abstract Idea ..... 19
C. The Claims Include an Inventive Concepts ..... 20
D. Monticello's Claims Pose No Risk of Pre-empting the Abstract Idea ..... 22
E. The Cases do not Support Finding Monticello's Claims Directed to an Abstract Idea ..... 23
F. No Decision Should be Made at this Early Stage ..... 25
V. CONCLUSION ..... 26

## TABLE OF AUTHORITIES

**Page**

### CASES

*Alice Corp. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) .......... passim

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012) .......... 3, 26

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......... 6, 11, 20, 22

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) .......... 3, 21, 26

*Bilski v. Kappos*,
130 S. Ct. 3218 (2010) .......... 4, 5

*Boom! Payments, Inc. v. Stripe, Inc.*,
839 Fed.Appx. 528 (Fed. Cir. 2021) .......... 24

*Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*,
59 F. Supp. 3d 974 (C.D. Cal. 2014) .......... 2, 4, 5, 22

*Card Verification Solutions, LLC v. Citigroup Inc.*,
1:13-cv-06339, 2014 WL 4922524 (N.D. Ill. Sep. 29, 2014) .......... 2

*CLS Bank Int'l v. Alice Corp. Pty.*,
717 F.3d 1269 (Fed. Cir. 2013) (*en banc*), *aff'd,* 134 S. Ct. 2347 (2014) .......... 3, 5, 20

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... 5, 15

*Diamond v. Diehr*,
450 U.S. 175 (1981) .......... 4, 6

*Enfish LLC v. Microsoft Corp.*,
827 F.3d 1327 (Fed. Cir. 2016) .......... passim

*Free Stream Media Corp. v. Alphonso Inc.*,
996 F.3d 1355 (Fed. Cir. 2021) .......... 25

*In re Elbaum*,
2021 WL 3923280 (Fed. Cir. September 2, 2021) .......... 24

*Innovation Sciences, LLC v. Amazon.com, Inc.*,
778 Fed.Appx. 859 (Fed. Cir. 2019) .......... 24, 25

*Kenexa BrassRing, Inc. v. HireAbility.com, LLC*,
No. CIV.A. 12-10943-FDS, 2015 WL 1943826 (D. Mass. Apr. 28, 2015) .......... 2

*Lormand v. U.S. Unwired, Inc.*,
565 F.3d 228 (5th Cir.2009) .......... 2

## TABLE OF AUTHORITIES
(continued)

**Page**

*Marble VOIP Partners v. Zoom Video Communications, Inc.*,
22-CV-2247-JAR-ADM, 2023 WL 3055323 (D.Kan, April 24, 2023) ......................15, 24, 26

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)........................................................................................................5

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016)........................................................................5, 6, 13

*Motio, Inc. v. Bsp Software LLC*,
154 F. Supp. 3d 434 (E.D. Tex. 2016).............................................................................22

*SCVNGR, Inc. v. DailyGobble, Inc.*,
238 F.Supp.3d 263 (2017) ...............................................................................................23

*Sydney, LLC v. Amazon.com Services, LLC*,
W-23-CV-00108, 2023 WL 5216815 (W.D. Tex, August 14, 2023).....................................12

*Symantec Corp. v. Zscaler, Inc.*,
No. 17-CV-04426-JST, 2018 WL 3539269 (N.D. Cal. July 23, 2018)..................................26

*Trading Technologies International, Inc. v. CQG, Inc.*,
675 Fed.Appx. 1001 (Fed. Cir. 2017)..........................................................................23, 24

*Twillo Inc., v. Telesign Corp.*,
16-CV-06925-LHK, 2017 WL 1208588 (NDCA March 31, 2017) ......................13, 14, 15, 25

*Ultramercial, Inc. v. Hulu, LLC*,
722 F.3d 1335 (Fed. Cir. 2013).............................................................................................2

*Ultramercial, Inc. v. Hulu, LLC*,
722 F.3d 1335 (Fed. Cir. 2013), *vacated sub nom.*, *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014), Vacated on other grounds ...................................................3, 26

*VeriPath, Inc. v. Didomi*,
842 Fed.Appx. 640 (Fed. Cir. 2021)....................................................................................15

*Whitley v. Hanna*,
726 F.3d 631 (5th Cir. 2013) ..................................................................................................2

*WildTangent, Inc. v. Ultramercial, LLC*,
134 S. Ct. 2870 (2014)............................................................................................................2

## STATUTES

35 U.S.C. § 101 ............................................................................................................ passim

## OTHER AUTHORITIES

https://www.uspto.gov/sites/default/files/documents/memo-berkheimer-20180419.PDF .............3

## RULES

Rule 12(b)(6).................................................................................................................2, 26

Plaintiff Monticello Enterprises, LLC ("Monticello") hereby submits its Opposition to Defendants Petco Health & Wellness Company, Inc., et al.'s ("Petco" or "Defendants") Motion to Dismiss (ECF No. 27).

## I. INTRODUCTION

"At some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal citations omitted). Because all inventions rest on abstract ideas, only a modicum of imagination, and a willingness to generalize, is required to recite any patent claim in abstract terms. In its Motion, Defendants attempt to capitalize on this fact by glossing over the details of Monticello's claims in order to characterize them as the mere abstract idea of electronic payments processing. But the specific language of the claims, which Defendants largely ignore, goes far beyond this mere generality to cover technical improvements to the way computer web browsers, mobile applications, and point-of-sale terminals operate to enable simpler and more efficient electronic payments that are more consistent across various platforms. Specifically, the Monticello patents disclose and claim an improved web browser, mobile application, and POS terminal, which includes an API or protocol that puts a website, application, or mobile device in a preconditioned state to simply confirm a payment without the need to manually enter payment and/or address data. By ignoring these features, Defendants fail to demonstrate that Monticello's claims are directed to an abstract idea, that they lack an inventive concept, or that they pre-empt any "building blocks of human ingenuity." *Id.*

Far from the "abstract idea" described by Defendants, the inventions disclosed and claimed in the Monticello patents reflect unconventional, new, and useful advances in electronic payments technology for which the United States Patent and Trademark Office has awarded Monticello a significant number of patents, including the asserted patents, often expressly stating that the patents claim patentable subject matter under 35 U.S.C. § 101.

Defendants are now asking the Court to disregard the expressly stated judgment of the patent examiner and declare Monticello's claims invalid. But to obtain the considerable relief they

request, Defendants have the burden to prove by clear and convincing evidence that (1) the asserted claims are directed to an abstract idea, and, if so, (2) the claims are devoid of any inventive concept that adds to that abstract idea. In other words, Defendants must demonstrate by clear and convincing evidence that the claims are "designed to monopolize the abstract idea itself." *Alice Corp.,* 134 S. Ct. at 2357. The Federal Circuit has recognized that this burden is especially great at the pleading stage, where claim construction has not yet been conducted and facts must be viewed in the light most favorable to the patentee. Defendants' Motion utterly fails to meet this burden.

For these reasons, the Court should deny Defendants' Motion.

## II. LEGAL BACKGROUND

### A. The Standard of Review for a Rule 12(b)(6) Motion

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may not be granted unless the court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiff." *Whitley v. Hanna*, 726 F.3d 631, 637 (5th Cir. 2013).

### B. A Finding of Invalidity at the Pleading Stage is Seldom Warranted

The Federal Circuit has explained that "it will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter. This is so because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338-39 (Fed. Cir. 2013), *vacated sub nom.*, *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014).[1] "Thus, dismissal is appropriate solely when the only plausible reading of the patent is that there is clear and convincing evidence of ineligibility." *Card Verification*, 2014 WL 4922524, at *2.

[1] Vacated on other grounds, but *Ultramercial* is often cited as persuasive for this point. *See, e.g., Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 1001 n. 6 (C.D. Cal. 2014); *Card Verification Solutions, LLC v. Citigroup Inc.*, 1:13-cv-06339, 2014 WL 4922524, at *2 (N.D. Ill. Sep. 29, 2014); *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. CIV.A. 12-10943-FDS, 2015 WL 1943826, at *2 (D. Mass. Apr. 28, 2015). *See also*, *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir.2009) ("Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted.") (citation omitted).

Moreover, "the analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues." *Ultramercial,* 722 F.3d at 1339. In *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), the Federal Circuit clarified that assessment of whether claims include and inventive concept, which requires determining "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." *Id.* at 1369. This holding has been adopted by the Patent Office and incorporated into the MPEP's guidance to patent examiners.[2] Because questions of inventive concept and scope of pre-emption require factual development and, often, construction of the claims, dismissal at the pleading stage is seldom warranted. *Ultramercial,* 722 F.3d at 1338-39.

The Federal Circuit further instructs that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012); *see also CLS Bank Int'l v. Alice Corp. Pty.,* 717 F.3d 1269, 1277 (Fed. Cir. 2013) (*en banc*)*, aff'd,* 134 S. Ct. 2347 (2014) ("[O]ne cannot meaningfully evaluate whether a claim preempts an abstract idea until the idea supposedly at risk of pre-emption has been unambiguously identified. Although not required, conducting a claim construction analysis before addressing § 101 may be especially helpful in this regard by facilitating a full understanding of what each claim entails.").

### C. Section 101 of the Patent Act

Section 101 of the Patent Act, 35 U.S.C. § 101, describes the types of subject matter that are eligible for patent protection and also "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp.*, 134 S. Ct. at 2354.

---

[2] *See*, April 19, 2018, Memorandum to the Patent Examining Corp from the Deputy Commissioner for Patent Examination Policy, Subject: Changes in Examination Procedure Pertaining to Subject Matter Eligibility, Recent Subject Matter Eligibility Decision (*Berkheimer v. HP, Inc*.). Available at https://www.uspto.gov/sites/default/files/documents/memo-berkheimer-20180419.PDF.

The "concern that drives this exclusionary principle is one of pre-emption," *i.e.* granting a patent monopoly on an abstract idea would impede innovation by tying up the building blocks of future ingenuity. *Id.*

At the same time, the Supreme Court in *Alice* warned courts to "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.* at 2354. The reason for this is simple: "at some level all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* Thus, the Supreme Court has cautioned that "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* (citing *Diamond v. Diehr*, 450 U.S. 175, 187 (1981)). Rather, "applications of such concepts to a new and useful end . . . remain eligible for patent protection." *Id.*

In light of these considerations, the Supreme Court emphasized the importance of "distinguish[ing] between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention. The former would risk disproportionately tying up the use of the underlying ideas . . . [t]he latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws." *Alice*, 134 S. Ct. at 2354-55.

1. *Software and Business Methods are Patent-Eligible*

There is no categorical prohibition on patents directed to computer software. "Computer software and codes remain patentable" after *Alice*. *Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 990 (C.D. Cal. 2014) (examining case law and statutes); *Enfish LLC v. Microsoft Corp.*, 827 F.3d 1327, 1335 (Fed. Cir. 2016) ("Nor do we think that claims directed to software, as opposed to hardware, are inherently abstract . . . ."). "[B]usiness methods are [also not] categorically outside of § 101's scope." *Bilski v. Kappos*, 130 S. Ct. 3218, 3228-29 (2010).

2. *The Supreme Court's Two-Part Test for Determining Patent Eligibility*

The Supreme Court has articulated a two-part test to determine whether a patent claim is directed to patentable subject matter or, alternatively, to a "building block of human ingenuity." *Alice Corp.*, 134 S. Ct. at 2355 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132

S. Ct. 1289 (2012)). The first part requires the Court to determine whether each asserted claim is directed to a patent ineligible "abstract idea." *Id.* If the Court determines that each claim is directed to an abstract idea, the second part of the test asks whether an "inventive concept" exists—whether there is an element or combination of elements that "ensures the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.*

***Step 1:** Is Each Patent Claim Directed to an Abstract Idea?*

To determine whether a patent claim is directed to an abstract idea, a court "must identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract." *Cal. Inst. of Tech.*, 59 F. Supp. 3d at 991. *Alice* step one is "a meaningful one," such that "a substantial class of claims are not directed to a patent-ineligible concept." *Enfish*, 827 F.3d at 1335. This first step requires "determin[ing] whether the claim at issue is 'directed to' a judicial exception, such as an abstract idea." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2355). No court has yet described a precise test to use when determining whether a particular claim is directed to an abstract idea. *See, e.g.*, *Alice*, 134 S. Ct. at 2357 ("[W]e need not labor to delimit the precise contours of the 'abstract ideas' category in this case.") "[A] claim is more likely to be abstract if it stands for a fundamental practice with a long history, like the method in *Bilski* for hedging risk." *Cal. Inst. of Tech.*, 59 F. Supp. 3d at 991. *See also*, *Alice*, 134 S. Ct. at 2356-57 (citing sources from the 1800s to show that the claimed concept of intermediated settlements was a "fundamental economic practice long prevalent in our system of commerce" and thus an abstract idea.)

Conversely, patent claims that "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet . . . [but] [i]nstead . . . claim[ a] solution . . . necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" are not directed to an abstract idea. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Also, patent claims that contain "reference to material objects or specific examples" are "concrete" and are generally not merely abstract ideas. *See CLS Bank Int'l*, 717 F.3d at 1299 (Rader, R. et al.

concurring-in-part). The *Alice* inquiry ends if the claims, as a whole, are not "directed to" an abstract idea. *McRO*, 837 F.3d at 1312.

***Step 2:*** *If Each Claim is Directed To an Abstract Idea, Does the Claim Amount to Significantly More than the Abstract Idea Itself?*

If the Court finds that each patent claim is directed to an abstract idea under step one, it must then determine under step two whether an inventive concept appropriately limits the claim such that it does not pre-empt a significant amount of inventive activity. This is "a search for an 'inventive concept'—*i.e.,* an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Alice*, 134 S. Ct. at 2355. Such an "'inventive concept' [is] sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357.

When conducting this analysis, it is vital that the Court not view individual claim limitations in a vacuum, but instead look at the claim as a whole. As the Supreme Court has explained, "it is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diehr*, 450 U.S. at 188. The Federal Circuit has recognized that whether the determination of patentability occurs as part of Step 1 or Step 2 of the analysis depends on the nature of the claims. *See Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (holding that because "the claims and their specific limitations do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea. We therefore defer our consideration of the specific claim limitations' narrowing effect for step two.") *See also*, *Enfish*, 822 F.3d at 1335.

### D. The Touchstone for Validity under § 101 is a Lack of Pre-emption

The entire purpose for conducting the two-part test articulated in *Alice* is to ensure that entire fields are not pre-empted by the issuance of a patent claim. *Alice*, 134 S. Ct. at 2354 ("We

have described the concern that drives this exclusionary principle as one of pre-emption.") When a claim does not tie up the use of the underlying abstract idea, there is "no comparable risk of pre-emption, and therefore [the claim] remains eligible for the monopoly granted under our patent laws." *Id.* at 2354-55. As the Court emphasized, "the pre-emption concern undergirds our § 101 jurisprudence." *Id.* at 2358.

## III. TECHNOLOGY AT ISSUE IN THE MONTICELLO PATENTS

Contrary to Defendants' assertion, Monticello's patents are about much more than electronic payment processing. The asserted Monticello patents, rather, disclose technical solutions to problems with prior art payment systems in order to improve the user experience when making electronic payments. '408:2:52-60.[3,4] The '408 patent, for example, discloses an improved web browser where an application programming interface ("API") is added to improve the performance of the web browser and allow a range of capabilities that were not previously available.

Online payments have been around since products were first sold on the Internet. Since the beginning websites deployed the "shopping cart" model, which has users place a product to be purchased into a virtual shopping cart. The user then completes a form to provide their credit card number and shipping address and complete the checkout process. Amazon later introduced "one-click" purchasing, which allowed shoppers on Amazon's website to complete purchases with just one click using credit card and address information stored by Amazon. But Amazon's "one-click" was only available to Amazon users. For every other online shopping experience shoppers confronted some variation of the "shopping cart" model, each website presenting shoppers with a different payment form and each requiring them to manually enter the information needed to complete the purchase. '408:1:59-2:4. The Monticello patents identified this problem, which is rooted in computer technology, and disclosed a way to bring the "one-click" experience to every website. *See, for example*, provisional Patent Application No. 61/972,879 ("'879 Provisional"),

---

[3] Citations to the Monticello patent specifications are in patent last 3:column:line format.
[4] The '408 patent was attached to the Complaint as Exhibit A (ECF No. 1-1).

filed March 31, 2014, to which the asserted patents claim priority, which disclosed the capability to "precondition[]" any "website," *i.e.*, not just amazon.com, "to be in a one-click state."[5]

One of the ways the Monticello patents disclosed for solving the problem of inconsistent payment experiences across different websites and for providing a "one-click" experience anywhere, was to introduce a new API, which could be used to pass payment data, address data, as well as navigation and input data in the background to enable the user to land on a site or application in a state preconditioned to be in a one-click state. '408:59:16-22. *See also*, '879 Provisional at ¶ 0088.

The role of the API in the disclosed system is illustrated in FIG. 19 from the '408 patent, reproduced below.[6] Fig. 19 shows how the API (1918), here used with a browser and associated with the merchant website, enables the separate communication of payment data between the browser and the merchant website.




*FIG. 19*

[5] '879 Provisional, Declaration of Bruce R. Zisser ("Zisser Decl."), Exhibit A. at ¶ 0001
[6] This figure appears as Fig 9 in the '879 provisional and with various other designations in each of the asserted patents.

The asserted patents also disclose how the API can be used in other contexts, including with mobile applications, ’266:41:45-48,[7,8] and at the point-of sale, *i.e.*, two devices being connected via a wireless link. ’828:50:57-51:2.[9,10]

Specifically, the Monticello patents disclose an improved web browser, which includes an API that puts a website in a preconditioned state to simply confirm a payment without the need to manually enter payment and/or address data. The API passes data in the background to reduce the friction of the user’s experience. The Monticello patents also disclose using the same approach in mobile applications and at the POS to enable near frictionless purchases.

These same techniques disclosed by Monticello in its provisional application on March 31, 2014, were introduced to the public months later when, in September, 2014, Apple introduced Apple Pay along with “an API for Apple Pay so developers can build the capability into new apps.”[11] The introduction of the unconventional APIs for payment processes changed the underlying computer technology to provide a consistent, simple, and improved method of enabling payments that changed the payment process and has now been adopted by thousands of websites, apps, and brick-and-mortar stores.

The claims of the asserted Monticello patents cover this improved technical capability, but they do not cover all ways of conducting online electronic payments or electronic payment processing and thus do not “pre-empt” the technology. Rather, the prior art methods, including the “shopping cart” model and Amazon’s “one-click” are still widely in use and not covered by Monticello’s claims.

## IV. ARGUMENT

Defendants have the burden to demonstrate by clear and convincing evidence that Monticello’s patents are invalid. Defendants have failed to do so. Defendants’ argument is based

---

[7] *See* also, ’879 Provisional at ¶ 0055.
[8] The ’266 patent was attached to the Complaint as Exhibit C (ECF No. 1-3).
[9] *See* also, ’879 Provisional at ¶ 0093.
[10] The ’828 patent was attached to the Complaint as Exhibit E (ECF No. 1-5).
[11] See: https://www.theverge.com/2014/9/9/6084211/apple-pay-iphone-6-nfc-mobile-payment.

primarily on mischaracterizations of the claimed invention, conclusory factual assertions, and inapposite case law. Defendants go through the motions of articulating an abstract idea, but the proposed idea is disconnected from the claim language and grossly generalizes what has been invented. Moreover, Defendants' argument regarding "inventive concept" rests entirely on details of selected preferred embodiments and out of context statements that ignore the fundamental features of the claims as a whole. Because Defendants have failed to demonstrate that Monticello's claims are directed to ineligible subject matter, the Court should reject Defendants' effort to invalidate Monticello's patents, especially at the pleading stage.

### A. The Patent Office has Already Determined that the Challenged Claims are Patent Eligible

The U.S. Patent and Trademark Office ("USPTO") has already concluded that the challenged claims are patent eligible. In the prosecution history for all but one of the asserted patents the patent examiner considered the patent eligibility issue and, in each of those cases, expressly concluded that § 101 did not preclude issuing the claims.

During prosecution of the '408 patent, for example, the patent examiner began his Reasons for Allowance by stating that he had not rejected the claims "under 35 U.S.C. §101 because the claims are an improvement to technology with no abstract or real-world equivalent." Zisser Decl., Exhibit B ('408 File History, 08/24/2017 NOA) at 8. He went on to explain that "the claims are directed to an improvement in internet payment processing utilizing a web browser. ***The functionality of the web browser is improved with the ability to authorize payment information***, and storing payment data to complete a transaction in separate and distinct manner from known methods . . . ." *Id*. at 8-9 (emphasis added). *See also*, Zisser Decl. Exhibit C ('186 File History, 01/16/2018 NOA) at 2.

Similarly, during prosecution of the '139 patent, the examiner stated:

> The claims in this applicant [*sic*] have never been rejected under §101 because the claims integrate the abstract idea into a practical application by reciting specific hardware which performs the respective steps, utilize ***an interactive browser interface and a browser application programming interface to process payment*** for a product which has no real-world analog, ***and is a technical***

> ***solution to a technical problem that constitutes significantly more than the abstract idea.***

Zisser Decl., Exhibit D ('139 File History, 10/28/2020 NOA) at 2 (emphasis added).[12]

During the prosecution of the '828 patent, which focuses on the merchant device operations at the point-of-sale, the examiner went into even greater detail, stating explicitly:

> ***The claims are patent eligible because they recite additional elements which are significantly more than the abstract idea*** integrating the idea into a practical application, and the claims ***represent an improvement to the wireless payment system technology***. ***The additional elements are*** a mobile device, . . . and ***a protocol for communicating payment data***. Together these additional elements integrate the abstract idea of receiving payment data into a practical application that utilizes the recited hardware to wirelessly process and confirm payment and security for the payment. ***There is no evidence that the claim recitations are well understood, routine, and conventional***. ***The claims add other meaningful limitations beyond generally linking the use of the judicial exception to a particular environment to transform the judicial exception into patent eligible subject matter*** such as "a combination of a first type of input and a second type of input, the first type of input comprising at least one button press . . . and the second type of input received from a user to confirm a payment for the purchase the second type of input not requiring any interaction with the display." ***These limitations are meaningful in that they improve upon wireless payment system technology*** which previously required opening an application on the mobile device or some other type of interaction precluded by the claims. ***The claims are not the mere instructions to apply the abstract idea on a computer because the claims recite details as to <u>how</u> the solution is accomplished***, do not merely invoke computers as a tool to perform an existing process, and ***the claims apply to a particular application in the specific field of point-of-sale payment processing***. The claims do not recite insignificant extra-solution activity because the limitations are core to the solution of the invention as described in the specification. ***In consideration of all the factors the claims recite patent eligible subject matter***.

Zisser Decl., Exhibit E ('828 File History, 04/21/2022 NOA) at 2 (emphasis added); *See also*, Zisser Decl., Exhibit F ('497 File History, 05/05/2022 NOA) at 2.

---

[12] The Federal Circuit has recognized that whether the determination of patentability occurs as part of Step 1 (*i.e.*, determining whether the claims are directed to an abstract idea) or Step 2 (*i.e.*, determining if the abstract idea includes an inventive concept) of the analysis depends on the nature of the claims. *See Enfish*, 822 F.3d at 1335; *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).

The patent examiner was in a good position to assess the eligibility of the patent claims and he determined that the claims were patent eligible. This Court should do the same, just as it did in *Ask Sydney, LLC v. Amazon.com Services, LLC*, W-23-CV-00108[-112, -113]-XR, 2023 WL 5216815 (W.D. Tex, August 14, 2023). In that case this Court took judicial notice of the prosecution histories (*id.* at *7) where the examiner had "determined that the amended claims provided an inventive concept by improving the 'technical field of recommendations.'" *Id.* at *9. This Court then concluded that the defendants' arguments are the same ones "considered and refuted by the USPTO. As such, Defendants have failed to prove invalidity by clear and convincing evidence." *Id*. Because the USPTO has already, on multiple occasions, considered the eligibility of the claims at issue and found them eligible, this Court should, as it has done before, defer to the USPTO and deny Defendants' motion.

### B. The Claims Are Not Directed To an Abstract Idea

Defendants attempt to satisfy the first step of the § 101 analysis by proposing an artificially broad and generalized abstract idea: "electronic payment processing," for each of the asserted patents. Defendants' Motion ECF No. 27 ("Motion"), at 1. Defendants' proposed abstract idea is fatally flawed because it ignores important aspects of the claim language at issue. The claimed invention is not "directed to" "electronic payment processing." "The directed to inquiry . . . cannot simply ask whether the claims *involve* a patent-ineligible concept, . . . Rather, [it must be] based on whether [the claims'] character ***as a whole*** is directed to excluded subject matter." *Enfish*, 827 F.3d at 1335 (emphasis added)(internal quotations omitted). The claims do not, as Defendants insist, simply recite generic computer functions for doing electronic payment processing because, when considered as a whole, they claim a specific technical solution to problems with prior art methods of completing electronic payments, *i.e.*, the new and useful API. The API, which was not part of prior art electronic payment solutions, enables a host of features making electronic payments more efficient, more consistent, and easier for the user. Defendants' refusal to engage with the API, which is "the focus of the claims," betrays the weakness of their arguments. *See Enfish*, 822 F3d. at 1335-36.

1. *Defendants Mischaracterize what the Asserted Claims are "Directed To"*

Defendant fails to engage the elements of the Monticello claims. According to Defendants, all of the claims are directed to the abstract idea of "electronic payment processing." Motion at 1. But this idea is far too broad to apply to Monticello's claims and does not come close to solving the problem addressed by those claims. The Federal Circuit has "cautioned that courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims" *McRO*, 837 F.3d at 1313 (internal quotations omitted). *See also*, *Enfish*, 822 F.3d at 1337 ("However, describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.")

In a classic § 101 attack, Defendants mischaracterize the inventions claimed in the Monticello patents in such broad terms that they are almost unrecognizable. They ignore the key specific feature of the claims, *i.e.*, the API, that enables the near frictionless electronic payments that were missing from the prior art. Defendants mischaracterize the claimed invention in each of the asserted patents the same way, as directed simply to "electronic payment processing." *See* Motion at 21, 24, 25, 26, 28, and 29. None of the claims, however, is directed to generic "electronic payment processing."

In *Twillo Inc., v. Telesign Corp.*, 16-CV-06925-LHK, 2017 WL 1208588 (NDCA March 31, 2017), the court also addressed claims having an API as an important feature of the claims. In that case defendants argued that the claims were directed to the abstract idea of "initiating and controlling a message . . . based on a request." The plaintiff responded by arguing that the claims, which comprised a combination that included "API resources" "constitutes a specific technical solution to a technical problem arising in computer networks." *Id*. at *23. The court, following the guidance of the Supreme Court and the Federal Circuit, agreed with plaintiff, finding that the claims were "directed to enabling a modern application server to process traditional telephony sessions through (1) translating telephony sessions . . . and (2) providing API resources." *Id*. at *25. The court recognized that the "directed to" statement, while lengthy, was necessary to capture

the character of the claim "as a whole," as the particular features of the claims, which included "using an API to access call router resources . . . are significant." *Id*.

Applying the same analysis here and considering the claims' "character as a whole" in light of the specification, *Enfish*, 822 F.3d at 1335, leads to a finding that the challenged claim are not simply directed to "electronic payment processing," but are specifically directed to an improved electronic payment process where existing computer components that process payments are modified by the introduction of an API in a way that changes the way the processes operate.

2. *The Asserted Claims are Not Directed To an Abstract Idea*

When determining whether something is an abstract idea, the Federal Circuit "and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F3d. at 1334. Because Defendants have mischaracterized the nature of the claims, the cases they rely on are inapposite. When other courts have considered claims where an API was used to solve a technical problem and change the operation of the underlying computer technology, those courts found that the claims were *not* directed to an abstract idea.

In *Twillo*, for example, the court concluded that the claims were not abstract because they were "directed to a specific improvement in a type of computer technology" and that both functions of the claims, including the "second function, providing API resources," were "a specific implementation of this improvement." 2017 WL 1208588 at *26-27. Citing *Enfish*, the court found that the claims at issue claimed a "specific variant" of processing telephony sessions, which "works differently than conventional approaches" and which "are or include specific technical implementation details that shift the focus of [the claims] beyond a disembodied, functional goal." *Id*. at *27. The court also found that, even though the claims did not "eliminate all design choices for a person of skill in the art," with the specification stating, for example "that the call router API can be 'any suitable programming interface,'" the claims are "specific enough that they confine implementation to a concrete universe of technical features that fall within a certain class. This

provides the 'how' for accomplishing the recited functions." *Id*. (internal quotations and citations omitted).

Similarly in *Marble VOIP Partners v. Zoom Video Communications, Inc.*, 22-CV-2247-JAR-ADM, 2023 WL 3055323 (D.Kan, April 24, 2023), the district court addressed claims that provide a "'core framework' . . . together with a relocated and newly available API – that is directed to *how* data should be processed." *Id*. at *7 (emphasis original). The court rejected defendant's argument that the claims were "directed to no more than an improvement to [an] abstract notion . . . that utilizes an API to achieve the desired result" and found that the claims, which featured a "newly available API," "involv[ed] a more efficient computer system – that is, a specific improvement in computer functionality." *Id*. at *7-8.[13]

The same rationale applies here. The Monticello claims are not directed to an abstract idea, but rather to a specific improvement in a type of computer technology that improved electronic payment processes by modifying existing computer components by the introduction of an API in a way that changes the way the processes operate. *See DDR Holdings,* 773 F.3d at 1257 (finding claims that "claim[ a] solution . . . necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" not abstract.)

*i. The '408 and the '186 Claims are Not Directed To an Abstract Idea*

The '408 and '186 patents disclose a "browser API . . . [that] solves [the] problem [of the prior art] in a more comprehensive way such that the payment process truly can be simplified down to its essential element in a way previously unachievable. For example, the site and the browser can exchange back and forth much more data in a more specific, strategic and tailored way then

[13] The *Marble VOIP* court cited to and distinguished *VeriPath, Inc. v. Didomi*, 842 Fed.Appx. 640 (Fed. Cir. 2021). In *VeriPath,* the Federal Circuit found claims that used an API as part of an exchange of privacy information to be directed to an abstract idea because they were "not focused on any technologic improvements to computer functionality . . . invoking a computer merely as a tool." *Id*. at 643 (internal quotations omitted). The *Marble VOIP* court nevertheless found that the claims in its case "did not fail the step one inquiry" because, like the Monticello claims and unlike the *VeriPath* claims, they were "more like claims involving a more efficient computer system – that is a specific improvement in computer technology." *Marble VOIP*, 2023 WL 3055323 at *8.

the old form filling approach." Noting that "[b]eing able to exchange much more information via the API enables a more efficient approach which will be noticeably easier to the user." '408:49:52-61. The patents are not, as Defendants contend, directed generically to an electronic payment process, but to an improvement to the underlying technology used to make electronic payments in order to simplify the user experience. '186:75:62-64[14] (when the "browser functionality [is] modified to communicate the necessary data via an API . . . [it can] simplify the purchasing process.")

The claims of the '408 and '186 patents expressly claim this improvement by requiring that, unlike traditional communications between a web browser and a web server, all communications related to payment data occur "via a browser payment request application programming interface." *See* '408 patent, claim 1 and '186 patent, claim 1. *See also*, '408 patent, Fig. 19, reproduced above at page 8, showing separate paths between the web browser and the API and the web browser and the merchant's website. These claims do not, therefore, as Defendants contend, simply claim "passing information back and forth by a computer." Motion at 22 and 25. Each challenged claim requires that each of the "receiving," and "transmitting" steps Defendants tout as generic (Motion at 1) are required to be made "via a browser payment request" API. The claims further specify that the API is specifically configured to "define[] a protocol for communicating authorized payment data between the site and the browser." In addition to the "receiving" and "transmitting" steps, the claims also require that the API "retriev[e] . . . authorized payment data," which is not related to simply "passing information back and forth by a computer" but to a specific interaction with, for example, the web browser itself or the device running the web browser. *See* '408 patent, claim 1.[15]

[14] The '186 patent was attached to the Complaint as Exhibit B (ECF No. 1-2).

[15] The "retrieving" step, which is present in all independent claims of the '408 patent but only independent claims 49 and 52 of the '186 patent, is an important feature that further distinguishes these claims from the generic "passing information back and forth by a computer" mantra Defendants rely on. *See* '186:148:65-154:28. This step is not, as Defendants contend, merely the "collaps[ing of] the middle 'communicating' and 'receiving' steps of claim 1" in the '186 patent. Motion at 14. Unlike Claim 1, where all the steps involve communicating data between a browser

The claims of the ’408 and ’186 patents, therefore, which claim much more than “electronic payment processing,” are not directed to an abstract idea.

*ii. The ’266 Claims are Not Directed To an Abstract Idea*

The ’266 patent is directed to applying the same basic functionality discussed above with respect to browser APIs used for communicating with websites “to a software module that is programmed to interface with an application on a user device.” ’266:211:54-58. The ’266 patent explains that “[i]n the app scenario, . . . a software module . . . can be programmed to perform all of the functionality . . . with respect to payments . . . . The application communicates with the software module in the same or similar basic way as the site communicates with the browser in [the browser] scenario. The software module can handle requests from the application” including a request for payment data where “[t]he software module . . . [can] provide through the protocol of the API, the authorized payment data for use in making a payment, confirming a payment or completing a payment.” ’266:211:58-212:11.

Claim 1 of the ’266 patent tracks this disclosure by claiming a “software module” and a “software module application programming interface,” where the software module API is specified as “defin[ing] a protocol for communicating data between the application and the software module.” *See* ’266 patent, claim 1. As with the ’408 and ’186 claims, this claim does not, as Defendants contend, simply claim “passing information back and forth by a computer.” Motion at 26. Rather the claim requires a specific “software module on a mobile device” that includes an API and that the application can only receive information from the software module “via the software module” API. The API changes the way the device works and “solves [the] problem [of the prior art] in a more comprehensive way such that the payment process truly can be simplified down to its essential element in a way previously unachievable.” ’266:87:2-6.

---

and some entity over a network, either “a site” or a “payment service,” the “retrieving” step of claims 49 and 52 includes “retrieving . . . authorized payment data from the browser [or] a device operating the browser . . . ,” *i.e.*, not over a network. This is an important distinction, which, among other things, precludes Claim 1 from being representative of *all* the claims of the ’186 patent.

*iii. The ’139 Claims are Not Directed To an Abstract Idea*

Defendants rely on claim 1 of the ’139 patent as a representative claim, but, like the claims of the ’408 and ’186 patents, the method claimed in claim 1 requires a “browser application programming interface” be part of the transmit and receive steps with respect to purchase and payment related data. As discussed above, the API changes the way the device works by enabling the “exchange [of] much more information” which in turn “enables a more efficient approach which will be noticeably easier to the user.” ’408:49:59-61. Claim 1, therefore, does not claim an abstract idea.

Defendants incorrectly assert, however, that claim 1 is representative of the claims of the ’139 patent because several of the eight independent claims in that patent are directed to an entirely different scenario. Most relevant here is claim 25, which is the claim Monticello identified in its Complaint. *See* ECF No. 1 at 19. Contrary to Defendants’ assertion, Claim 25 does not “essentially consolidate the steps of claim 1 in a single ‘transmitting’ step and a single ‘receiving’ step.” Motion at 18.[16] Where claim 1 is focused on communications between a server and a browser, claim 25 is directed to a communication between an “application operating on a device” and “a module on the device” where that communication is “according to an application programming interface that defines a protocol for communicating data between the application and the module on the device.”

---

[16] Claim 25 of the ’139 patent recites:
“25. A method comprising:
transmitting, from an application operating on a device, to a module on the device that controls a user interface and according to an application programming interface that defines a protocol for communicating data between the application and the module on the device that controls the user interface, a request associated with a potential purchase, wherein the request comprises information about the potential purchase; and
receiving, at the application, from the module that controls the user interface and according to the application programming interface, authorized payment data, wherein the module that controls the user interface retrieved, based on the request, the authorized payment data for the potential purchase from one of the module that controls the user interface, the device operating the module that controls the user interface or a network-based entity separate from the device.”
*See* Exhibit D to the Complaint (ECF No. 1-4).

In Claim 25, the application and the module are both part of the device and, more like claim 1 of the ’266 patent, is directed to adding an API that “defines a protocol for communicating data between the application and the module.” The API changes the way the underlying system operates to enable the communication of greater amounts of data related to payments and thereby simplifying the payment process for the user.

For the reasons set forth above, neither claim 1 nor claim 25 claim an abstract idea because both are directed to changes to the underlying technology and not just “passing information back and forth by a computer” as Defendants contend.

*iv. The ’828 and ’497 Claims are Not Directed To an Abstract Idea*

The ’828 and the ’497 patents both claim an application of the same improvements discussed above but where, for example, a merchant’s website, depicted as 1916 in Fig. 19 above at page 8, “can represent a separate device [at a merchant’s brick and mortar location] that a user mobile device communicates with via a wireless link via a payment application programming interface, specification or protocol for passing the payment data via the wireless link.” ’828:39:12-16. By contrast, the ’497 patent, for example, claims “a communication [is established] between [a] merchant device and a user device via a wireless link” as part of making a purchase, where the merchant device receives “user payment data from a memory of the user device . . . according to a protocol for communicating the user payment data to the merchant device.” ’497 patent, claim 1.[17] As with the other Monticello patents, the protocol changes the way data is communicated in order to simplify the payment process “in a way previously unachievable.” ’408:49:52-61.

In addition to claiming an improvement to the underlying technology for communicating payment data, the claims of the ’828 and ’497 patents also claim very specific physical processes for authenticating the user to ensure that only authorized purchases are made. For example, claim 1 of the ’828 patent requires “at least one button press of a physical button” and a “second type of input received from a user to confirm a payment . . . [and] comprising a security measure to prevent

[17] The ’497 patent was attached to the Complaint as Exhibit F (ECF No. 1-6).

unauthorized purchases . . . ." This claim also specifies "not requiring any interaction with the display," which is unconventional in the point-of-sale context and enables a one-click-like user experience at the point-of-sale.

As the Examiner noted in his Reasons for Allowance for the '828 patent, "[t]he claims are not the mere instructions to apply the abstract idea on a computer because the claims recite details as to how the solution is accomplished, do not merely invoke computers as a tool to perform an existing process, and the claims apply to a particular application in the specific field of point-of-sale payment processing."[18] These tangible implementations of the claims further support a conclusion that the claims are not directed to an abstract idea. *See CLS Bank Int'l*, 717 F.3d at 1299 (Rader, R., et al. concurring in-part) (patent claims that contain "reference to material objects or specific examples" are "concrete" and are generally not merely abstract ideas.)

### C. The Claims Include an Inventive Concepts

If the Court were to adopt Defendants' characterization that the claims are simply directed to "electronic payment processing" and thereby conclude that the claims are directed to an abstract idea, the Court should nevertheless find that the details discussed above describing how the claims are directed to an improvement to the underlying computer technology satisfy step 2 of the *Alice* analysis. *See Bascom,* 827 F.3d at 1349 (holding that because "the claims and their specific limitations do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea. We therefore defer our consideration of the specific claim limitations' narrowing effect for step two.")

Defendants attempt to show that the claims do not include an inventive concept by, again, refusing to engage with the claim limitations. In fact, Defendants mention an "API" only once when arguing the challenged claims lack an inventive concept, but this reference is taken completely out of context.[19] Motion at 27. Instead, Defendants pluck words like "standardized"

---

[18] Zisser Decl., Exhibit E at 2; Exhibit F at 2.

[19] As part of their argument that the '139 patent claims lack an inventive concept, Motion at 27, Defendants imply that the API that is at the heart of the Monticello claims is interchangeable with a "standardized protocol" by making the false statement that the specification discloses that the

and "normal" from the specification and use them out of context to argue that the claims are not inventive. As explained above and concluded by the examiner, "the claims are an improvement to technology" Zisser Decl., Exhibit B at 8. "The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367 (quotations omitted). This is exactly what the examiner found: "There is no evidence that the claim recitations are well understood, routine, and conventional." Zisser Decl., Exhibit E at 2. Moreover, this "is a question of fact . . . that . . . must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368.

The specification does not, as Defendants' allege, "admit[]" anything that supports Defendants' argument. The "standardized specification of parameter data" Defendants cite (*e.g.*, Motion at 24) is not, as Defendants imply, describing some industry standard for the API. Rather it is explaining that "to achieve the overall objective of enabling a payment process" as claimed, the *parameter data* would need to be "standardized." '408:50:58-61. Similarly, the "normal payment system" Defendants refer to (*e.g.*, Motion at 24) simply describes how payment information is handled by the *merchant*, after it has been transferred by the claimed method and thus is outside the scope of the claimed invention. *See* '408:55:20-24.

The claims are directed to "a novel browser [or application or device] having an API [or protocol] through which information is exchanged to simplify the payment process." '408:49:39-41. The "browser API . . . solves [the] problem [of the prior art] in a more comprehensive way such that the payment process truly can be simplified down to its essential element in a way previously unavailable." '408:49:52-56. Adding the API to the browser represents an improvement to the underlying technology used to make electronic payments in order to simplify

"claimed electronic payment processing can be performed using 'an API or a standardized protocol . . . for communicating with a product identification,'" citing the '139 patent at 65:13-17. In context, the quoted statement is not referring to the claimed API, which is used to communicate payment data, but to a *different* API used to communicate product identification data as part of a different disclosed invention related to automated in-store shopping carts. *See* '139:64:53-65:37.

the user experience. '186:75:62-64 (when the "browser functionality [is] modified to communicate the necessary data via an API . . . [it can] simplify the purchasing process."). This improvement is not vitiated by the fact that the browser runs on a generic computer. *See, e.g.*, *Bascom*, 827 F.3d at 1350, where the Federal Circuit found that "the installation of a filtering tool at a specific location" in a computer *system* was an inventive concept, recognizing that this was not some technical improvement to the underlying generic computers, but to the system overall. *Id*. at 1351. *See also Motio, Inc. v. Bsp Software LLC*, 154 F. Supp. 3d 434 (E.D. Tex. 2016) (finding claims directed to business intelligence software operating on generic computers to include an inventive concept.) The same can be said for Monticello's claims because the use of an API to communicate payment data was not conventional or routine at the time Monticello filed its applications.

To the extent Defendants argue that the various claim limitations—and the claimed combinations of those limitations—are well-understood or generic, they do no more than raise factual disputes that cannot be resolved on the pleadings.

**D. Monticello's Claims Pose No Risk of Pre-empting the Abstract Idea.**

One glaring omission underscores Defendants' failure to demonstrate that the claims are directed to an abstract idea: their avoidance of the issue of pre-emption. This is remarkable, given the primacy of pre-emption in the § 101 "abstract idea" analysis. *See Alice*, 134 S. Ct. at 2354 ("We have described the concern that drives this exclusionary principle as one of pre-emption."); *Id*. at 2358 ("the pre-emption concern . . . undergirds our § 101 jurisprudence"). Defendants make no attempt to demonstrate that the claims "would risk disproportionately tying up the use of the underlying ideas" of electronic payment processing. *Id*. at 2354. Nor do Defendants assert that Monticello's patent claims are "a drafting effort designed to monopolize the abstract idea" of electronic payment processing. *Id.* at 2357. Defendants avoid this issue because there is no danger that any of Monticello's claims will pre-empt "building blocks of human ingenuity." *Id.* at 2354.

"By definition, every patent pre-empts an area of technology." *Cal. Inst. of Tech.*, 59 F. Supp. 3d at 990. But Monticello's claims cover a very specific method of making electronic payments that leave unencumbered many alternative methods, which remain in common use. For

example, Monticello's claims do not pre-empt the old form-filling shopping cart approach still available on most websites, including Defendants', that allow customers to enter credit card and other information. Monticello's claims also do not pre-empt other specialized approaches used by some online marketplaces, such as Amazon.com's "one-click" or the PayPal approach that was in use in 2013, prior to the filing of the priority patent applications to the asserted patents, and still widely used today. Defendants offer their customers many ways to make electronic payments on their websites, through their mobile apps, and in the store, but only Defendants' offering of Apple Pay and similar mobile payment technologies are accused in this case. Defendants' failure to manufacture any pre-emption rationale further demonstrates the arbitrary and artificial nature of the supposedly abstract idea they recite. The Court should not find claims ineligible that do not pre-empt the abstract idea as it has been articulated by Defendants.

### E. The Cases do not Support Finding Monticello's Claims Directed to an Abstract Idea

The Federal Circuit has held that patents concerning electronic financial transactions are valid under § 101 where, as here, the claims provide improvements to the underlying technology. For example, in *Trading Technologies International, Inc. v. CQG, Inc.*, 675 Fed.Appx. 1001 (Fed. Cir. 2017), the Federal Circuit affirmed a finding that claims directed to electronic trading of stocks did not claim an abstract idea because they were "directed to improvements in existing graphical user interface devices," with the court recognizing that a "threshold criterion of an abstract idea and an ineligible concept" is that it "is not an idea that has long existed." *Id*. at 1004. *See also*, *SCVNGR, Inc. v. DailyGobble, Inc*., 238 F.Supp.3d 263 (2017), finding that claims directed to a method of processing a transaction at a point-of-sale terminal "actually improve upon the function of payment processing" and, therefore, do not claim an abstract idea. *Id*. at 268. The same is true with the Monticello claims.

But, more importantly, Defendants have cited no case where a court has rejected claims that added an API to improve the underlying technology, regardless of the technical field.

By overgeneralizing the alleged abstract idea in the Monticello claims, Defendants seek to mislead the Court into concluding that there is some general rule that all claims involving some aspect of payments are abstract. As the cases discussed above demonstrate, however, this is not so. None of the cases Defendants rely on address claims like Monticello's, which include improvements to the underlying technology. In *In re Elbaum*, 2021 WL 3923280 (Fed. Cir. September 2, 2021), for example, the claim added nothing to the generic steps of "storing, receiving, analyzing, and processing data," allowing these steps to be done "by any possible means." *Id*. at *2. Similarly, in *Boom! Payments, Inc. v. Stripe, Inc*., 839 Fed.Appx. 528 (Fed. Cir. 2021), the court found that "the claims are directed to the abstract idea of payment escrow. They only describe steps of passing information back and forth by a computer" and that "the order and timing of the claim elements are merely the necessary steps of executing payment escrow and so do not constitute an inventive concept." *Id*. at 532-533. Again, unlike the Monticello claims, which change the underlying technology by adding an API or protocol that passes payment data in the background to reduce the friction of the user's payment experience, the claims in *Boom! Payments* add nothing to the technology used to perform the steps related to the claimed escrow payments. *See id.* at 530.

Defendants' reliance on *Innovation Sciences, LLC v. Amazon.com, Inc*., 778 Fed.Appx. 859 (Fed. Cir. 2019), is also misplaced. In *Innovation Services*, the court found the claims directed to an abstract idea because they "recite [the invention] in merely functional, result-oriented terms . . . [that do] not purport to improve the payment server or the server on which the item for purchase is listed." *Id*. at 863. The Monticello claims, by contrast, *do* improve the payment process by adding an API or protocol, which allows "the site and the browser [to] exchange back and forth much more data in a more specific, strategic and tailored way . . . [which] enables a more efficient approach which will be noticeably easier to the user." '408:49:52-61. The Monticello claims are more like those in *Marble VOIP*, where the court rejected defendant's argument that the claims were "directed to no more than and improvement to [an] abstract notion . . . that utilizes an API to achieve the desired result" and found that the claims, which featured a "newly available

API," " involv[ed] a more efficient computer system – that is, a specific improvement in computer functionality." *Marble Voip*, 2023 WL 3055323 at *7-8. In *Innovation*, the court was concerned that a claim using purely "functional, result-oriented" language would "[i]nstead of claiming a solution for producing that result, [would] in effect encompasses all solutions" *Id*. at 863 (internal quotations omitted). The Monticello claims, however, do not "encompass all solutions" related to electronic payment processing, as Defendants contend. Rather, as discussed more fully in Section IV.D, above, the Monticello claims encompass just one way of conducting electronic payments, leaving many other ways, including every payment processing system existing in 2013, outside the scope of the claims.[20]

Monticello was not, as Defendants imply, required to provide every detail of how the API works or how other ancillary features of the claims function. Motion at 23-30. As the district court found in *Twillo*, even though the specification explained that the claimed API "can be any suitable programming communication interface," the claims, simply claiming an API, are "specific enough that they confine implementation to a concrete universe of technical features that fall within a certain class. This provides the 'how' for accomplishing the recited functions." 2017 WL 1208588 at * 27. (internal quotations and citations omitted). The same is true here where the claims specify, for example, that the API "defines a protocol for communicating authorized payment data between the site and the browser." '408 patent, claim 1.

**F. No Decision Should be Made at this Early Stage**

The Court cannot resolve the issues raised by Defendants' motion until it resolves outstanding issues of fact. "Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." *Berkheimer v. HP Inc.*, 881

[20] The same analysis distinguishes *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355 (Fed. Cir. 2021). In that case the claims were directed to targeted advertising and claimed a specific result, *e.g.*, "to cause a rendering of the targeted data to the user through the sandboxed application of the mobile device," but without claiming any mechanism for achieving this result. *Id*. at 1359, 1363-64. The Monticello claims, by contrast, do not expressly claim a result, *e.g.* a simplified payment process, but, instead, claim the specific steps and underlying technical improvement, including communicating through an API or protocol, necessary to achieve such a result.

F.3d at 1369. *Berkheimer* further holds that what is and is not "generic" in the claims is a fact question that cannot be resolved on a motion to dismiss. This is the genesis of the Federal Circuit's warning that "the analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues." *Ultramercial*, 722 F.3d at 1339. Indeed, district courts have relied on *Berkheimer* to deny motions to dismiss under § 101 for precisely this reason. *See Symantec Corp. v. Zscaler, Inc.*, No. 17-CV-04426-JST, 2018 WL 3539269, at *3 (N.D. Cal. July 23, 2018) ("Based on the patent's discussion of the novelty of a hierarchical organization and information sharing system for UTMs, the 'question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact.'") (*quoting Berkheimer*, 881 F. 3d at 1368.) This principle is especially applicable where, as here, the technology is not readily understood by those who, like the Court, are not experts skilled in the art. All of these issues underscore the fact that a decision at the pleading stage forecloses the "full understanding of the basic character of the claimed subject matter" necessary to the § 101 analysis. *Bancorp*, 687 F.3d at 1273-74. *See also*, *Marble VOIP*, 2023 WL 3055323 at *9 ("the Court concludes that resolution of the *Alice* step one analysis would be inappropriate at this [Rule 12(b)(6)] stage of the proceedings . . . . Because the patent contains technical subject matter, the Court is unable to effectively evaluate it on its face alone.")

## V. CONCLUSION

The Patent Office has already expressly determined that the Monticello claims are patent eligible. This conclusion is supported by the fact that the claims are directed to an improvement to the underlying technology used in electronic payments and not, as Defendants contend, to the generic concept of electronic payment processing. Whether the details of the claimed API or protocol are considered under Step one or Step two of the *Alice* framework, the Monticello claims easily clear the § 101 hurdle. This is especially true because the claims present no risk of pre-empting all electronic payment processing as many ways of making electronic payments remain unencumbered by the claims. For these reasons, Defendants have failed to meet their burden to

demonstrate by clear and convincing evidence that the asserted claims are invalid under § 101. Accordingly, Monticello respectfully requests that the Court deny Defendants' Motion.

Dated: March 7, 2024

MANATT, PHELPS & PHILLIPS, LLP

/s/ *Bruce R Zisser*
Bruce R. Zisser (CA Bar No. 180607) (*pro hac vice*)
BZisser@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Tel.: 310.312.4000
Fax: 310.312.4224

Amar L. Thakur (CA Bar No. 194025) (*pro hac vice*)
AThakur@manatt.com
695 Town Center Drive, 14th Floor
Costa Mesa, CA 92626
Tel.: 714.371.2500
Fax: 714.371.2550

GEORGE BROTHERS KINCAID & HORTON LLP

B. Russell Horton
Texas Bar No. 10014450
rhorton@gbkh.com
114 W. 7th Street, Ste. 1100
Austin, Texas 78701
Tel.: (512) 495-1400
FAX: (512) 499-009

*Attorneys for Plaintiff Monticello Enterprises, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of March, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Bruce R. Zisser*
Bruce R. Zisser